IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| JULIE CANNOY, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-05-311 |
| | § | |
| JO ANNE B. BARNHART, | § | |
| COMMISSIONER OF SOCIAL SECURITY | § | |

## REPORT AND RECOMMENDATION

Before the Court is Plaintiff Julie Cannoy's action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), requesting judicial review of a final decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits under Title II of the Social Security Act. Both parties have filed motions for summary judgment. After considering the parties' motions and the record in this case, the Court submits its Report and Recommendation to the District Court.

### Background

Plaintiff filed her application for disability insurance benefits on May 10, 2000, (with a protective filing date of April 19, 2000), alleging an inability to work since January 1, 1997, due to complications from multiple sclerosis. Transcript ("Tr.") at 135, 138. Plaintiff's claims were denied initially and on reconsideration. A hearing was held on March 6, 2003, and the Administrative Law Judge ("ALJ") issued an unfavorable decision on April 30, 2003. Tr. at 28. On April 1, 2005, the Appeals Council declined Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner.

At the time of the administrative hearing, Plaintiff was a fifty-one year old woman with a bachelor of science degree in nursing and a master's degree. Shortly after obtaining her RN, Plaintiff was hospitalized with a sudden onset of nausea, vertigo, ataxia, uncoordinated movements, (primarily on her left side), a dull, remitting headache, and fatigue (she was sleeping 18-20 hours per day). An examination by a renowned neurologist, Dr. Bernard Patten, revealed an abnormal spinal fluid count and other abnormal laboratory indices. Dr. Patten's initial impression was that indices and symptoms precluded a definitive diagnosis at the time, and pointed to either an intracranial aneurysm, multiple sclerosis, encephalomyelitis or a recurrent meningitic disease. TR. at 247. Dr. Patten recommended that Plaintiff begin using a walker. He reported his results to Plaintiff's primary care physician, Dr. Louis. In the few years following 1987, Plaintiff's symptoms presented acutely, i.e. the symptoms were "relapsing-remitting." She was prescribed injectable steroids which worked well and acted to relieve her symptoms for the short term, though as time progressed it became necessary for her to continually increase the dosage for relief. After the symptoms abated in 1987, Plaintiff attempted to resume her nursing career but was unable to meet the physical demands and was told by her employer that she could not continue. Therefore, Plaintiff went back to school in 1991 to earn her masters degree, which allowed her to pursue a less physically demanding job, teaching. She states that even this effort would not have been possible had it not been for the relief of symptoms by the injectable steroids. TR at 332. In 1996, however, the dosage of steroid medication that became necessary to alleviate Plaintiff's symptoms was so high that her physicians discontinued them for other health and safety reasons, and she was started on a regime of experimental drugs for multiple sclerosis. Betaseron injections, which were administered every other day, was the first drug prescribed and she tolerated it poorly. On the day of each

injection, Plaintiff suffered chills, nausea, vomiting and a 102 degree fever, followed by one day of relief. Plaintiff endured this treatment regime for eighteen months until it was discontinued because of its side effects. TR at 328-330. The next drug prescribed was Avonex, but it too had to be discontinued because it caused her to suffer grand mal seizures.

In 2002, Plaintiff tried working at her husband's office, answering the phone for a few hours, two or three days per week. By this time, Plaintiff was taking a different, and last available experimental drug for multiple sclerosis, Copaxone, which made her even more nauseated and dizzy than she previously had been. These symptoms made part-time work impossible. Plaintiff states that since the discontinuation of the steroid injections in 1996, it is rare when she is not dizzy, nauseated and fatigued. Plaintiff states that she has weakness in her left leg and arm, and, to a lesser degree, weakness on her right side. She is too weak to lift her seven pound grandchild. She must use a cane to walk, as she ambulates with an ataxic gate and drags her left foot. If she is forced to walk or stand without a cane, she falls down. TR. at 343. If she stands, she can only do so for three to five minutes if she is holding on to something. TR. at 343. Sitting poses less of a problem but she can only do so for approximately two hours per day. On some days she is able to dress herself, on others, not. Her husband must help her bathe and shower. Plaintiff enjoys cooking but can only push, not lift, pots and pans. She states that she spends most days laying down.

Plaintiff has submitted numerous medical records into evidence in connection with her application. Dr. Edward Louis, who has treated Plaintiff since 1986, notes that Plaintiff has left-side weakness in her arms and legs with left foot-drop and ataxia. He also notes complaints of nausea, dizziness and fatigue. TR. at 251, 264-267. In his Medical Source Statement, Dr. Louis states that Plaintiff can stand or walk continuously for only fifteen minutes once, per eight-hour day;

3

can only sit continuously for thirty minutes twice, per eight-hour day; and requires at least four hours of rest per eight-hour day for pain management and four hours of rest per eight-hour day for fatigue. TR. at 265. Dr. Louis also reports that Plaintiff should rarely, if ever, lift more than five pounds or reach, grasp or finger with her left hand; and, only occasionally reach, grasp or finger with her right arm and/or hand. TR. at 266. Dr. Louis states that the above restrictions have persisted since 1997. It is Dr. Louis' medical opinion that Plaintiff suffers from "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station". He notes that all her extremities including her hips are involved, except her right leg and foot. TR. at 269. It is also Dr. Louis' medical opinion that Plaintiff suffers from significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." TR. at 270. Dr. Louis states that Plaintiff's condition has existed and persisted to the level of severity described from at least January, 1, 1997. TR. at 270.

Since the onset of her symptoms in 1986, Plaintiff has also been examined and treated by several renowned neurologists. They include: Dr. Bernard Patten - Baylor College of Medicine, (from1987-1991); Dr. Fabian - University of Texas Medical Branch at Galveston, (from 1994-1998); Dr. Khaduja (2000); Dr. Wolinsky - University of Texas at Houston Medical School, (2002)[1]; Dr. Anigbogu (2002); Dr. Ashizawa - Baylor College of Medicine (2003), and current chair of neurology at the University of Texas Medical Branch at Galveston; and, Dr. Stephen Goldstein

---

[1] The Court would note that complete medical records from Dr. Wolinsky are not available as they were destroyed in the massive flood in Houston in 2004.

(2003). Plaintiff explains that after the diagnosis of multiple sclerosis in 1987, her attacks and symptoms were largely controlled by steroids and she only saw a physician when she was having an attack. (Although Plaintiff has been followed by one or more of the esteemed physicians listed above since 1987, her visits have largely been controlled by acute need and financial ability.)

In order to determine whether the ALJ applied the proper legal standards and whether substantial evidence supports the ALJ's final decision to deny the Plaintiff benefits, the Court has reviewed the entire record. Clearly, Plaintiff has multiple sclerosis; the definitive diagnosis was made in 1991 after an MRI of her brain was performed. TR. at 273. Although Plaintiff's neurological symptoms were not exactly the same each time she saw a physician, the following findings by Plaintiff's physicians, which are significant and consistent, were noted:

1.  Drs. Ashizawa, Louis, Wolinsky and Khanduja: Plaintiff suffers from weakness and diminished strength in her left arm and leg, and an abnormal sensory exam.

2.  Drs. Ashizawa, Louis, Fabian and Anigbogu: Plaintiff complains of fatigue;

3.  Dr. Ashizawa: pain, weakness, left foot drop, ataxic gate; can't stand with feet together;

4.  Dr. Fabian: nausea, ataxic gate; left foot-drop; dizziness; left side incoordination;

5.  Dr. Khanduja: vertigo, occasional slurred speech; unsteady gait; lacks smooth saccadic eye movements.

In their final assessments, Plaintiff's physicians state the following:

1.  Dr. Fabian (June 1, 1998): "This letter is to confirm that Ms. Julie Cannoy-Osburn is totally and permanently physically disabled and is unable to work." TR. at 259.

      2.      Dr. Wolinsky (October 20, 2002): Plaintiff suffers from "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." TR. at 276. Plaintiff suffers from "significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." TR. at 277.

      3.      Dr. Ashizawa (March 5, 2003): Plaintiff suffers from "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." TR. at 285. Plaintiff suffers from "significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." TR. at 286.

      4.      Dr. Louis (June 22, 2002):  Plaintiff suffers from "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." TR. at 269. Plaintiff suffers from "significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." TR. at 270.

In denying Plaintiff's claim, the ALJ found:

1. The claimant met the special earnings requirements of the Social Security Act on January 1, 1997, the date she stated she became disabled, and continued to meet them through March 31, 2003.

2. The claimant has not engaged in substantial gainful work since the alleged onset date of disability.

3. The claimant has a diagnosis of multiple sclerosis, but this condition does not meet or equal in severity the requirements of any of the medical listings in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's testimony was not fully credible or consistent with the record considered as a whole.

5. The claimant has the residual functional capacity to perform sedentary work.

6. The claimant has the residual functional capacity to perform her past relevant work as a bookkeeper.

7. The claimant has not been under a "disability" as defined in the social Security Act, at any time through the date of this decision.

A federal court reviews the Commissioner's denial of benefits only to ascertain whether (1) the final decision is supported by substantial evidence and (2) the Commissioner used the proper legal standards to evaluate the evidence. *Brown v. Apfel*, 192 F.3d 172, 173 (5th Cir. 1999). A court may not reweigh the evidence or try the issues *de novo. Johnson v. Bowen*, 864 F.2d 340, 343-344 (5th Cir. 1988). Conflicts in the evidence are for the Commissioner, not the Court, to resolve. *Brown*, 192 F.3d at 496.

Substantial evidence is defined as being more than a scintilla and less than a preponderance and of such relevance that a reasonable mind would accept it as adequate to support a conclusion. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). If the Commissioner's findings are adjudged to be supported by substantial evidence, then such findings are conclusive and must be affirmed.

*Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson*, 864 F.2d at 343-344. Four elements of proof are weighted by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education and work experience.

Plaintiff has the burden of proving that she has a medically determinable physical impairment that has lasted at least twelve months and prevents her from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1572(a) and (b). The ALJ must use a five step process in evaluating disability claims to decide whether: (1) the claimant is not working in substantial gainful activity; (2) the claimant has a severe impairment; (3) the claimant's impairment meets or equals a listed impairment in the Appendix of the Regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other work. 20 C.F.R. § 404.1520.

Plaintiff argues that the ALJ failed to conduct a proper vocational analysis; erroneously failed to follow proper legal standards in finding that Plaintiff is not disabled *per se,* a conclusion that is not supported by substantial evidence; and, failed to adhere to the legal standards applicable to treating-doctor opinions.

The ALJ determined that the Plaintiff had not engaged in substantial gainful work since the onset date of her disability (step one), that she suffered from multiple sclerosis, a severe impairment (step two), but that her impairment did not meet or equal the severity of the listed impairment of

multiple sclerosis for which she would be found presumptively disabled (step three). In addressing whether Plaintiff retained the residual functional capacity to perform either her past relevant work (step four) or some lesser level of work activity (step five), the ALJ determined that Plaintiff retained the residual functional capacity to perform the exertional requirement of a full range of sedentary work, including her past relevant work as a bookkeeper.

Moving sequentially through the five-step process in evaluating claims of disability, the ALJ determined, at step-three, that Plaintiff's condition of multiple sclerosis does not meet or equal in severity the requirements of any of the medical listings in 20 C.F.R. Pt. 404, Subt. P., App. 1, § 11.09. Under 11.09A, a disability must be found as a matter of law if a claimant has a significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. As noted above, not one but three physicians who treated Plaintiff over a period of years stated in their interrogatories that Plaintiff met the above-stated criteria, including muscle fatigue, muscle weakness, dizziness and nausea. The ALJ chose to discredit the opinions of these physicians, however, concluding that Plaintiff had no significant problem using her hands because she was able to perform household chores. The ALJ discounted Plaintiff's alleged weakness and extreme fatigue that forces her to lie down most of the day because "the majority of the records in evidence suggests that this symptom is not as severe as alleged," even though a complaint of fatigue is listed in most records of her routine physicians. The ALJ discounts Plaintiff's testimony that she experiences nausea and fatigue on most days because "there are no medical records to support that allegation." Indeed, the ALJ is wrong. Fatigue is noted in the records of Drs. Fabian, Louis and Ashizawa. The records also indicate that medications were discontinued and new medications prescribed until there were no

9

more medications to try because of the associated side-effects of dizziness, nausea and flu-like symptoms.  No consideration appears to have been given this significant fact.

The ALJ also gave little to no weight to the medical opinion of Dr. Louis, Plaintiff's physician since 1986, because she felt the records were incomplete and inconsistent with Plaintiff's claims.  The ALJ gave little weight to Dr. Fabian's medical opinion, even though he had been Plaintiff's treating neurologist since 1987.  She rejected Dr. Fabian's medical opinion because she felt his opinions were conclusory and unsupported by clinical evidence.  Although both Dr. Ashizawa and Dr. Wolinsky determined, through physical examinations of Plaintiff as well as her past record, that she was *per se* disabled, she gave their medical opinions little weight because they had only examined her once and their medical records appeared to be incomplete.  The ALJ did, however, give controlling weight to the medical expert, Dr. Goldstein, who never examined the Plaintiff.  Dr. Goldstein stated that "the claimant's record did not show the typical clinical findings" for one with multiple sclerosis, although he did concede that her MRI was consistent with multiple sclerosis as were the medications that Plaintiff was prescribed. TR. at 24.  Dr. Goldstein was concerned with the lack of records from Dr. Wolinsky and Ashizawa and felt that the findings of Dr. Anigbogu were inconsistent because Plaintiff's actual capabilities did not seem to comport with clinical findings, which suggested that she should be in worse physical shape than she appeared.  Dr. Goldstein felt that on the one hand her symptoms did not appear to be so severe as to warrant the use of a cane, even though Plaintiff drags her left foot when she walks, and, on the other hand, her ataxia was so severe that a cane would not help.  Dr. Goldstein impugned the reputation of Dr. Patten, a highly respected neurologist who treated Plaintiff for several years, and the ALJ gave Dr. Patten's medical opinion absolutely no weight.

Given the testimony of Plaintiff's treating physicians, and the indeterminate nature of Dr. Goldstein's testimony, the Court finds little evidence to support the ALJ's conclusion that Plaintiff is not *per se* disabled under 11.09.  The ALJ bases her conclusion on lack of clinical evidence and Dr. Goldstein's report; however, absent other medical opinion evidence based on personal examination or treatment of the claims, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).  She did not attempt to do so. The opinion of the treating physicians who are familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability.  *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995).  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with...other substantial evidence." 20 C.F.R. § 404.1527(d)(2).  In this case, the ALJ gave virtually no weight to the medical opinions of Plaintiff's treating physicians and made absolutely no effort to obtain additional medical records in order to conduct a proper evaluation.  Instead, the ALJ based her finding at step three on a perceived lack of complete medical documentation and inconsistent findings, the testimony of the medical expert, Dr. Goldstein, who never examined Plaintiff, and her disbelief of relevant portions of Plaintiff's testimony.  An ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999), and has a duty to "develop the facts fully and fairly relating to an applicant's claim for disability benefits." *See Ripley*, 67 F.3d at 557.  If the ALJ does not discharge this duty, then the decision is not substantially justified." *Id.*  Here, the ALJ found little meaning in the medical records and interrogatories of Plaintiff's treating physicians and erred when she failed to fill

questionable gaps in the medical records with further inquiries before making a determination as to the weight of their medical findings and conclusions.  This is not a case where the medical opinions of Plaintiff's physicians and the medical expert are largely at odds with one another or where a clearly contrary position has been revealed.  In fact, no physician rebutted the finding that Plaintiff was a severely disabled individual suffering from multiple sclerosis.  This is a case where the ALJ summarily rejected the medical opinions of Plaintiff's treating physicians because she felt the records were incomplete or inconsistent.  She looked to the inconsistencies of  incomplete records and the opinion of a physician who had never treated  Plaintiff, in making the determining that Plaintiff's disability did not meet the criteria of 11.09.  The ALJ should have requested clarification and did not.  This Court therefore **RECOMMENDS** that this cause be reversed and remanded on this issue.

The ALJ also determined that Plaintiff exaggerated with respect to her pain,  fatigue and functional limitations and found that she retained the residual functional capacity to perform the exertional requirements of a full range of sedentary work, including her past relevant work.  A vocational expert testified at the hearing and,  in a response to a hypothetical question posed by the ALJ that did not include the specific limitations and disabilities established by the medical evidence, stated that the Plaintiff could be gainfully employed in the national economy because she could perform a number of sedentary jobs.  The VE stated that such work could include part-time bookkeeping or part-time receptionist.  When asked if "there would be any transferable skills from past relevant to other semiskilled or skilled work at the sedentary level," the VE identified jobs such as medical appointment clerk, admitting clerk, dietary clerk and blood bank clerk.  When asked to extend the hypothetical to an individual who required four hours of rest in an eight hour day, the VE

could give no opinion. TR. at 380. In making her determination, the ALJ ignored the medical opinions of Plaintiff's physicians but noted that Dr. Ashizawa found, in one examination in 2003, (which was one examination out of sixteen years of examinations), that Plaintiff displayed normal findings in her upper extremities. The ALJ also found that because Plaintiff stated that she could fold clothes, perform other household chores and use scissors, she therefore had no significant problems using her hands. The ALJ stated that Plaintiff's testimony was not credible and determined that there was no medical documentation to support her claims. In essence, the ALJ attempted to determine Plaintiff's level of functioning on good days but failed to consider the effects of her medication or assess her residual functioning capacity on a continuing, day-to-day basis as she is required to do. 20 C.F.R. § 404.1545(e) and 20 C.F.R. §404.1523. Even the medical expert testified that Plaintiff could only function on a part-time basis as a bookkeeper.

In judging RFC, the ALJ must determine a claimant's ability to do "sustained work-related physical and mental activities in a work setting on a regular and continuing basis," *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), and determine whether the claimant can "maintain regular employment" for more than a limited period of time. *Leidler v. Sullivan*, 209 F.3d 448, 453 (5th Cir. 2000). The Court can find no evidence in the record where anybody stated that Plaintiff was able to perform full-time work. While the ALJ determined that Plaintiff could perform a job as a bookkeeper, (which she determined to be a past relevant job), as correctly noted by Plaintiff, the ALJ failed to make a finding of fact as to the physical and mental demands of the past job/occupation. *See* Soc. Sec. Admin., SSR 82-62 (1982). "Before concluding that a claimant can return to her prior work, the ALJ must first "directly compare the applicants remaining functional capacities with the physical and mental demands of previous work." *Latham v. Shalala*, 36 F.3d 482 (5th Cir. 1994).

Plaintiff testified that she is nauseated and dizzy most of the time (one reason why her medications had to be changed or discontinued), and fatigued to a point where she must lay down for most of every day. Her treating physicians stated that she should either not work or should not work more than two to fours hours per eight hour days, with four hours of rest per each eight hour day. The ALJ rejected these claims of nonexertional impairment, however, and concluded that they were less than credible. An ALJ's assessment of a claimant's credibility is accorded great deference, however, the record does not contain substantial evidence to support her decision that Plaintiff had no nonexertional impairments. In fact, evidence suggests that it was the severity of Plaintiff's non-exertional impairments that made treatment so difficult. There appears to be no medication that Plaintiff can tolerate. While Plaintiff may be able to fold clothes and wash dishes, there is no evidence that she can do so on a daily regimented basis; in fact, the evidence suggests just the contrary. There is substantial evidence in the record establishing that Plaintiff has suffered significant nonexertional impairments due to her medication as well as her disease. If an individual's medical treatment significantly interrupts the ability to perform a normal, eight-hour work day, the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity. *Epps v. Harris*, 624 F.2d 167, 1273 (5th Cir. 1980). The ALJ failed to make this determination. The Court **RECOMMENDS** that this issue be reversed and remanded for consideration of the effects of Plaintiff's treatment on her ability to be gainfully employed during the period of claimed disability.

The ALJ improperly rejected Plaintiff's treating physicians' medical opinions that Plaintiff's condition meets the guidelines of 11.09 without contradictory evidence from physicians who had examined or treated her and without requesting additional information from treating physicians

before rejecting their opinions as unsupported or conclusory. Further, the ALJ erred in failing to consider the exact mental and physical parameters of the work Plaintiff was deemed able to perform in the past and expected to perform today, failed to show that bookkeeping qualified as past relevant work, failed to properly apprise the vocational expert of all parameters to be considered before posing questions, and failed to consider the effects of Plaintiff's medication on her ability to work.

Accordingly, for the aforementioned reasons, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (Instrument no. 17) be **GRANTED**; that Defendant's Motion for Summary Judgment be (Instrument no. 19) be **DENIED** and that this cause be **REVERSED** and **REMANDED to the ALJ for further consideration consistent with this opinion.**

The Clerk shall send copies of this Report and Recommendation to the Parties. The Parties **SHALL** have until **September 22, 2006**, in which to have written objections, filed pursuant to 28 U.S.C. § 636(b)(1)(C), **physically on file** in the Office of the Clerk. <u>The Objections **SHALL** be electronically filed and/or mailed to the Clerk's Office at P.O. Drawer 2300, Galveston, Texas 77553.</u> **Any Objections filed SHALL be contained in a written document specifically entitled "Objections to the Report and Recommendation of the Magistrate Judge"**, which will then be forwarded to the District Judge for consideration. Failure to file written objections within the prescribed time **SHALL** bar the aggrieved party from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

**DONE** at Galveston, Texas, this ___6th___ day of September, 2006.

John R. Froeschner
United States Magistrate Judge